UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BECKY FISK, et al,

Plaintiff,

v.

GOVERNOR JAY INSLEE, et al,

Defendant.

CASE NO. C16-5889RBL

ORDER

THIS MATTER is before the Court on competing motions for summary judgment. At issue is the constitutionality of a state statute (RCW 41.56.113(1)(b)(i)) and a Collective Bargaining Agreement (CBA) between the Union (SEIU 775) and the State of Washington in light of the U.S. Supreme Court's decision in *Harris v. Quinn*, 134 S. Ct. 2618 (2014).

**BACKGROUND**

The Washington Department of Social and Health Services pays Individual Providers (IPs) to provide home-based care to persons who qualify to receive assistance from the agency. RCW 74.39A.240(3). On November 6, 2001, state voters approved Initiative 775, which established a single statewide bargaining unit for IPs that now bargains directly with the

Governor. IPs overwhelmingly elected SEIU 775 as their representative. The first CBA between the State and SEIU 775 was signed in January 2003.

SEIU 775 treats all IPs who pay full Union dues as members, per its constitution and bylaws. Prior to the 2015 Supreme Court's *Harris v. Quinn*, 134 S. Ct. 2618, article 4.1 of the CBA had "an agency shop union security clause" that required the State to deduct either Union member dues or non-member agency fees from the paychecks of *all* IPs. Under an "agency shop" arrangement, a union that acts as exclusive bargaining representative may charge nonunion members, who do not have to join the union or pay union dues, a fee for acting as their bargaining representative, also known as a fair-share agency fee. *Chicago Teachers Union, Local No. 1, AFT, AFL-CIO, et al. v. Hudson*, 106 S. Ct. 1066, 1074 n. 10 (1986). In *Abood v. Detroit Board of Education*, the Supreme Court considered the constitutionality of a Michigan statute authorizing a union and a local government employer to agree to an "agency shop" arrangement requiring every employee, whether a union member or not, to pay the union a service fee. *See* 431 U.S. 209, (1977). The Supreme Court distinguished between collecting mandatory fees from non-union members for a union's administrative, grievance, and bargaining expenditures and for its political or ideological expenditures, holding the former constitutional and the latter not. *See id*. at 232, 237.

Until *Harris*, IPs who did not wish to be Union members had three choices: They could (1) pay an agency fee that was the equivalent of full monthly membership dues but decline membership; (2) object to paying the full agency fee equivalent of dues and instead pay a reduced agency fee per *Chicago Teachers Union v. Hudson*, or; (3) object to paying an agency fee on religious grounds and pay the equivalent of full member dues to charity.

Before *Harris*, the Union sent new IPs a notice explaining their rights and obligations under the CBA's union security clause upon hire. This was done through a packet known as the "U-1 packet." It contained a cover letter, a *Beck-Hudson* notice, the local and international *Beck-Hudson* audits, a membership card, a business reply envelope, and a voter registration form. The notices informed newly hired IPs they were not required to be a member of the Union, may decline membership at any time, and need not sign a membership card. SEIU 775 also annually sent notices to IPs about their rights to withdraw from Union membership and/or pay reduced agency fees. These notices also reiterated that IPs need not sign a membership card.

On June 30, 2014, the Supreme Court decided *Harris v. Quinn*. There, the Court held that the First Amendment prohibits a state from collecting fair-share agency fees from employees who wish neither to join *nor* financially support a union where the employees are not "full-fledged public employees." The day after the decision, SEIU 775 asked the State to cease paycheck deductions for the portion of the IP bargaining unit who had previously objected to paying full Union dues.

On July 17, 2014, SEIU 775 changed the U-1 packet such that all IPs who were mailed the packet upon hire after June 30, 2014, received the following language:

> In light of the legal uncertainty created by the United States Supreme Court's June 30, 2014, decision in *Harris v. Quinn*, the Union is not at this time requiring that you provide any financial support for the Union. If you do not wish to provide financial support to the Union, please inform us by sending a letter with your name, address, and telephone number and stating that you do not wish to financially support the Union. You may use the enclosed postage prepaid return envelope to do so, or you use your own envelope addressed to: Secretary-Treasurer, SEIU 775, 215 Columbia Street, Seattle, WA 98104. If you tell us you don't want to support the Union financially, you will not be charged any Union dues or fees, but deciding to withdraw from membership means you will lose all rights to vote for your employment contract, for or against dues increases, and in Union officer elections. …. If you do not respond to this notice, we will take it to mean you wish to provide financial support to the Union and will be charged through a payroll deduction.

Glickman Dec. ¶ 10.  In addition, in August 2014, SEIU 775 notified all existing IPs who had not previously objected, *even if they had signed a membership card*, that they were not required to be Union members or to financially support the Union.

On September 26, 2014, the State and SEIU 775 entered into (1) a Memorandum of Understanding ("MOU") that modified article 4 of the operative 2013-2015 CBA, and (2) a Tentative Agreement ("TA") with respect to article 4 for the 2015-2017 CBA.  Both the MOU and the TA provided that while the State would deduct membership dues or non-member fees in accordance with its obligation under RCW 41.56.113(1)(b)(i), IPs who did not wish to join or financially support the Union could opt out of paying any dues or fees whatsoever.  The 2015-2017 CBA incorporated the relevant terms of the TA.

Since October 15, 2014, article 4.1.B has required SEIU 775 to notify new IPs as soon as possible, and no later than 14 days from the date the Union receives the IP's contact information, that they are not required to join or financially support the Union, and will suffer no penalty as a result.  This notice is part of a packet that the Union still calls a "U-1."

The U-1 packet informs the IP that, to avoid paying the Union any money at all, she has 30 calendar days to opt out of Union membership.  If the IP opts out, SEIU 775 refunds the money with interest (at the rate of interest the Union received).  A newly hired IP who does not opt out within 30 days of being notified of her right to opt out will be treated as an SEIU 775 member and assessed monthly dues until such time as he or she opts out.  An IP who has not signed an SEIU 775 membership card may choose at any time to opt out of future Union dues and fees.

Although the State and SEIU 775 removed the prior agency shop union security clause effective September 26, 2014, article 4.1.C of the CBA still contains a union security provision.

Article 4.1.C provides that an IP who chooses to sign an SEIU 775 membership card must pay all assessed union dues and fees unless and until the card is validly revoked. Article 4.1.C further states: "The Employer shall honor the terms and conditions of each home care worker's signed membership card."

In addition to the post June 30, 2014, U-1 notices and the August 2014 notice, SEIU 775 sent out notices in January 2015, January 2016, and March 2017 to current IPs who had neither signed a membership card nor objected. These notices informed IPs of their right to opt out of Union membership and to decline to provide financial support to the Union, with no penalty. These notices also told IPs that they don't have to sign a membership card.

IPs voluntarily sign membership cards to show their commitment to the Union and its work on their behalf. The SEIU 775 membership card at issue in this case contains the following language:

> In exchange for obtaining special benefits through exclusive access to the SEIU 775 Membership Plus Benefits Program, I authorize my employer(s) to deduct from my wages all Union dues and other fees or assessments as shall be certified by 775 under its Constitution and Bylaws and to remit those amounts to 775. This authorization is irrevocable for a period of one year from the date of execution and from year to year thereafter, regardless of my membership status, unless not less than thirty (30) and not more than forty-five (45) days prior to the annual anniversary date of this authorization or the termination of the contract between my employer and the Union whichever occurs first, I notify the Union and my employer in writing, with my valid signature, of my desire to revoke this authorization. 775 is authorized to use this authorization with my current employer(s) and with any other employer(s) in the event I change employers or obtain additional employment.

This is known as the "Version 5" card.

Until January 2014, the SEIU 775 membership card did not provide that an IP's dues authorization was irrevocable for up to one year. The addition of such language in January 2014 was the result of an internal planning process to strengthen the Union. The irrevocability of a

Union member's dues authorization for a set period provides SEIU 775 with financial stability by ensuring a predictable revenue stream. Based on the number of signed cards, SEIU 775 can forecast how much revenue it will receive over a given year and budget accordingly. The Union can also make long-term financial commitments without the possibility of a sudden loss of revenue. In addition, the irrevocability of the dues authorization prevents IPs who sign cards from gaming the Union's system of governance. An IP cannot, for example, pay dues for only a month to become eligible to vote in a Union officer election or attend the Union's convention and then renege on all future financial contributions.

There are three ways an IP can "sign" an SEIU 775 membership card: by written signature, by voice authorization, or by accepting the card online. If an IP signs a membership card via voice authorization or online, the Union immediately sends the IP an email or a letter confirming that she signed the card, along with a copy of the language of the card. The email and letter direct the IP to call the Union's Member Resource Center if it was not her intent to sign the card. An IP who signs a card through voice authorization or online may within 30 days opt out of all financial obligations to SEIU 775, notwithstanding the irrevocability language of the membership card.

Since the spring of 2016, the Union has enforced the language of the membership card making authorizations for dues deductions irrevocable for up to one year as follows:

If an IP who has signed a membership card containing such language resigns or objects to membership the Union immediately registers that in its database and sends a confirmation to the IP. If the IP has resigned membership or objected to membership *within* the window period for revocability, the Union notifies the State to cease deductions immediately. If an IP resigns or objects *outside* the revocability window, SEIU 775 does not require the IP to resign/object again

within the revocability window. Instead, SEIU 775 informs the IP (1) he is outside a window period, (2) the date his window period will open; (3) deductions will continue until the beginning of that window period; and (4) the IP does not need to do anything else for deductions to stop after the window opens. When the window period opens, the Union notifies the State to cease payroll deductions. If an IP submits a resignation outside of the window period, she is given the option of remaining a Union member while her payroll deductions continue. Unless the IP returns this form, her membership in SEIU 775 immediately ceases. However, the IP's member benefits continue as long as the IP is having dues/fees deducted from her paychecks.

SEIU 775 does not enforce the membership card's dues authorization provisions if an IP signs a card before receiving a "U-1" packet or other notification from the Union that membership is not required. In addition, SEIU 775 ceases deductions and refunds previously collected dues (with interest) when an IP opts out within 60 days of the date that SEIU 775 transmitted the U-1 packet to the IP. If, however, the IPs signs another membership card more than 60 days after receiving a U-1 packet, the Union will enforce the latter card.

The plaintiffs in this lawsuit object to and challenge the constitutionality of the irrevocability of the promise to have the employer deduct dues and other fees from their wages until the window opens and they can opt out from their past commitment to the union. They argue that their letter of objection and rescission of support for the goals of the union should be effective immediately, including immediate cessation of deduction of union dues and fees by the employer. In this case, the promise made by the employees, supported by adequate consideration, is sufficient to withstand the argument of free speech and free association violations.

# SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. At 251-52. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24.

# ANALYSIS

**A. A signed Membership Card is a valid contract.**

The Union provides adequate notice that failure to join the Union will not impact the terms of her employment. All an opponent to Union membership need do is sign an opt-out card and they are removed from the roll of the Union and no deductions from wages for Union fees and dues will be made in the future. If the IP signs a membership card she accepts the terms of the contract as follows:

1. Becomes a member of the Union with the right to participate (voting) in the governance (at least indirectly) of the Union;

2. Receives a modest life insurance policy;

3. Has fees and dues deducted from her wages;

4. The term of the contract is indefinite but terminated by quitting the job of IP or opting out in writing from Union membership.

5. Once opting out, dues and fees will no longer be deducted from wages at the next "window" opportunity, in no event longer than one year from anniversary date from joining (irrevocability).

The right to make contracts about one's affairs is a part of the liberty protected by the due process clause. Within this liberty are provisions of contracts between employee and Union, or employer and employee determining the wages to be paid or affecting other issues of employment. In making contracts of employment, generally speaking, the parties have equal right to obtain from each other the best terms they can by private bargaining. Legislative abridgement of that freedom can only be justified by the existence of exceptional circumstances. Freedom of contract is the general rule and restraint the exception. *Morehead v. People of the State of New York ex rel. Tipaldo*, 298 U.S. 587, 610-11 (1936) (overruled in part by *Olsen v. State of Nebraska ex rel. Western Reference & Bond Ass'n*, 313 U.S. 236 (1941)).

The freedom to contract is rooted in the due process clause of the Fifth and Fourteenth Amendment. It is the bedrock upon which the economic engine provides the goods and services necessary for a thriving society. A worker has every right to voluntarily associate with a union in order to promote better working conditions and wages. Correspondingly, a worker can refuse to associate with or join a union. That is her prerogative. But, once she joins voluntarily, in writing, she has the obligation to perform the terms of her agreement. The freedom of speech and the freedom of association do not trump the obligations and promises voluntarily and knowingly assumed. The other party to that contract has every reason to depend on those

promises for the purpose of planning and budgeting resources.  The Constitution says nothing affirmative about reneging legal and lawful responsibilities freely undertaken.

The Court hereby **GRANTS** Defendant SEIU 775's Motion for Summary Judgment [Dkt. #36], **GRANTS** the State Defendants' Motion for Summary Judgment [Dkt. #35], and **DENIES** the Plaintiffs' Motion for Summary Judgment [Dkt. #40].

**IT IS SO ORDERED.**

Dated this 16th day of October, 2017.

Ronald B. Leighton
United States District Judge